OPINION
{¶ 1} Defendant-appellant, Chantel L. Grooms, was indicted by the Franklin County Grand Jury on one count of obstruction of official business, with a physical harm specification, in violation of R.C. 2921.31, one count of resisting arrest, with a physical harm specification, in violation of R.C. 2921.33, and one count of assault on a police officer, in violation of R.C. 2903.13. Appellant entered a plea of not guilty, and a jury trial commenced on September 24, 2003. At the close of the state's case, appellant moved for a judgment of acquittal, pursuant to Crim.R. 29. The motion was denied. At the close of her case, appellant again moved for a judgment of acquittal. That motion was also denied. The jury returned a verdict finding appellant guilty of the lesser-included offense of obstructing official business and resisting arrest and not guilty of assault. Appellant was sentenced to serve 30 days on count one and 30 days on count two, with the sentences to run concurrent with each other. The trial court then suspended appellant's sentence of imprisonment and placed her on probation for a two-year period of time with certain conditions.
 {¶ 2} Appellant filed a notice of appeal from her conviction and sentence and sets forth the following two assignments of error:
I. The jury's verdicts finding the appellant guilty of obstruction of official business and resisting arrest were not supported by law or the evidence.
II. The trial court erred in overruling appellant's motion for judgment of acquittal pursuant to ohio criminal rule 29.
 {¶ 3} Three witnesses testified on behalf of plaintiff-appellee, State of Ohio ("the state"). Joshua Silverman, a police officer for the Minerva Park Police Department, testified that, on August 3, 2002, he observed Karen Grooms, appellant's mother, drive through a stop sign, and Officer Silverman pulled her over. Danielle Jackson, Grooms' 14-year-old daughter, was in the car with her. Officer Silverman asked Grooms for her license and registration, which she produced, and, after running her license through LEADS, Officer Silverman learned that her license had been suspended and that the automobile she was driving was registered to a William Hawthorne. (Tr. 41-44.) Officer Silverman informed Grooms that she was being placed under arrest because she was driving under a suspended license. Officer Silverman handcuffed Grooms and placed her in the back of his cruiser. Jackson sat in the cruiser as well. During this time, Officer Silverman also discovered that Grooms had warrants out for her arrest regarding traffic violations. Officer Silverman inventoried the automobile because it would be towed and impounded. (Tr. 44-46.)
 {¶ 4} Officer Silverman was sitting in the front seat of his cruiser completing paperwork relative to Grooms' arrest and waiting for the tow truck when appellant rode up on her bicycle. Appellant went through the car her mother had been driving and then came and demanded that Officer Silverman give her the keys so that she could drive the car home. Officer Silverman explained to her that the automobile would be impounded and that she could not drive it without the owner's permission. Officer Silverman testified that appellant started to become angry, walked away from him and then returned with a cell phone and told him that the owner of the automobile was on the phone. Officer Silverman spoke with a man who identified himself as William Hawthorne and explained to the man that the car was going to be impounded. As Officer Silverman testified, he could not be sure that the person to whom he was speaking on the cell phone actually was Mr. Hawthorne and could not, based solely upon the phone call, release the car to appellant. Officer Silverman gave appellant the phone back and explained that he still would not be able to release the automobile to her. Officer Silverman testified that he told appellant there was nothing more that she could do, that her mother was going to jail, and asked her to simply take her sister home. At that point, appellant became more angry and began yelling and screaming things such as the following:
"Give me the car back, you can't to this, this is BS" * * *
* * *
"This is bullshit. You can't do this shit. Give me the keys to the car. What are you doing?"
(Tr. 53-54.) Officer Silverman testified that appellant's face was approximately six inches from his face while she was yelling, and that he explained to her that she was making it impossible for him to finish his paperwork. Thereafter, appellant continued yelling in spite of the fact that Officer Silverman had told her there was nothing she could do, that he could not complete his paperwork with her yelling at him, and that she should just leave. Thereafter, an exchange took place between appellant and Officer Silverman, which he described as follows:
At first, I was very polite to her, asked her to leave, told her why she needed to leave. I explained to her, "I cannot do my paperwork with you standing here. The sooner you leave, the sooner I can get your mom out of here, the sooner she has a bond and the sooner she can go home."
She refused to leave. I asked her roughly about 15 times to leave the scene. She refused every time.
* * *
Then I finally ended up telling her, "You've got two choices. Either you leave or I'm going to take you to jail for obstructing my official business. I can't do my paperwork with your standing six inches from me, yelling and screaming at me."
* * *
She said, "Fuck you. You cannot take me to jail." At that point, I opened the door to the car, stepped out. She went ballistic, saying the door touched her. She was standing literally right outside my door when I opened it.
* * *
I believe it touched her. I believe it may have touched her. She was standing two inches from the door.
* * *
She started yelling and cussing, saying, "You can't fucking touch me. What are you doing? You hit me with a door." F you this, F you that. "What the hell are you doing? I'm not leaving. You can't make me leave. You can't arrest me. You have no reason to arrest me."
* * *
At that point, I got more assertive with her. I pointed my finger at her. I may have touched her with my finger. I told her, "You either leave right now — this is your last warning — or I'm taking you to jail."
* * *
At that point, she stepped toward me, shoved me in the chest real hard, said, "Fuck you," and said, "I'm not leaving."
* * *
She used both hands and hit me in the chest.
* * *
At that point, I grabbed a hold of her arm. She took a swing at me. I let go of her, blocked the punch. She took off running.
* * *
At that point, I asked for more cars and took off running after her.
* * *
* * * She got two houses away. I grabbed her. She started pulling away from me again. I sprayed her with a short burst of pepper spray in the face.
* * *
* * * she dropped down to one knee and got back up again.
* * *
At that point, I grabbed her, tried to put her in handcuffs. she started kicking, scratching, punching, and we ended up in a wrestling match on the ground.
* * *
We started rolling around the ground. I was yelling into my radio, "Officer in trouble." I ended up hitting my emergency banner.
* * *
We kept rolling back and forth. At one point, she was on top. At one point, I'm on top. I'm yelling, "Stop fighting me. You're under arrest." I was screaming at her over and over again to stop resisting.
* * *
As soon as I got off her, she grabbed the front of my shirt and pulled me back down on top of her. As soon as we started rolling around the ground the second time, I had my handcuffs in my hand. I was screaming for her to stop resisting.
* * *
I struck her one time with a closed fist. I struck her in the head because that was the closest thing to me, and my handcuffs were in my hand.
(Tr. 54-59.)
 {¶ 5} At this time, Officer Silverman heard Jackson yelling at him to stop hurting her sister, and when he turned to look, he saw that Jackson had exited the police car and was running toward them. Officer Silverman testified that appellant had already tried to grab his gun once and that he was concerned that if Jackson jumped on him, he would lose control of his firearm and someone would get hurt. As such, Officer Silverman pulled his gun on Jackson and ordered her to get down on the ground. (Tr. 60.) Ultimately, Officer Silverman handcuffed both girls.
 {¶ 6} Deanna Kem, a resident on Minerva Lake Road near the location where the incident took place, also testified. Her sons saw police cars, and she went outside to see what was happening. Kem saw Officer Silverman open the door to his cruiser and saw appellant getting angry. She testified that she saw appellant hit Officer Silverman in the chest, and she could hear her yelling, although she could not discern exactly what she was saying. (Tr. 118-127.) Kem also testified that, as Officer Silverman tried to arrest defendant, defendant was not cooperative. It appeared to Kem that Jackson was trying to help appellant.
 {¶ 7} Liane Buckingham, another resident on Minerva Lake Road, also testified on behalf of the state. Buckingham testified that she heard a lot of screaming and yelling and, when she exited her house, she saw Officer Silverman with one girl on the ground and yelling at a second girl to stay where she was. Buckingham went back inside the house and told her daughter not to come outside. Buckingham then came back outside and saw Officer Silverman directing the second girl, Jackson, to the place where appellant was. All the while, she heard the girls yelling. (Tr. 145-148.)
 {¶ 8} At that point in the trial, appellant moved, under Crim.R. 29, for a judgment of acquittal as to all counts. The motion was overruled by the trial court.
 {¶ 9} Karen Grooms, appellant's mother, was the first witness to testify for the defense. Grooms testified that Officer Silverman was not very friendly with her right from the beginning. Specifically, she testified that when he handcuffed her, he made the handcuffs too tight, and she had to ask him to loosen them. (Tr. 176-178.) Grooms testified further that Officer Silverman allowed her to call appellant so that appellant could come get the car and take Jackson home. When appellant arrived, she was polite and asked if she could take the car home. Officer Silverman told her that the car was going to be impounded and that she should take her sister and go home. Appellant then handed Officer Silverman her cell phone and indicated that the owner of the vehicle was on the phone. Officer Silverman spoke with Mr. Hawthorne, then, upon ending the phone conversation, threw the cell phone at appellant. Appellant picked up the cell phone and then Officer Silverman opened the door to his cruiser and hit appellant with it. At that time, appellant told Officer Silverman that he was rude, and Officer Silverman responded by saying that everyone was going to jail. Thereafter, according to Grooms, Officer Silverman sprayed appellant with an entire can of mace, grabbed her by the hair, put her on her stomach, and beat her repeatedly about the head and face with his handcuffs. Jackson exited the car yelling for Officer Silverman to stop hurting her sister. Officer Silverman pulled his gun on Jackson. Grooms testified that, even after he had handcuffed appellant, Officer Silverman continued to beat her about the head. (Tr. 164-173.)
 {¶ 10} Danielle Jackson, appellant's sister, also testified. Jackson testified that Officer Silverman was nasty with appellant from the very beginning, that he brushed her off as if she was not even there. She indicated that Officer Silverman threw the cell phone at appellant, hit appellant with the door of the car, and that, after appellant called him rude, Officer Silverman attacked her. (Tr. 199-202.) At that time, Jackson yelled at Officer Silverman to leave her sister alone. It was then that Officer Silverman pulled his gun on Jackson, hit appellant again, and when Jackson got up again, simply trying to reach the cell phone, Officer Silverman pulled his gun on her again. (Tr. 202-206.) Jackson testified further that Officer Silverman handcuffed her, rolled her over by appellant, put his knee on appellant's neck and hit her again. Jackson testified that neither of the girls attempted to get back up again. (Tr. 218-220.)
 {¶ 11} Appellant testified as well. Appellant received two telephone calls from her sister and rode her bicycle to the place where her mother was being arrested. Appellant indicated that she said hello to Officer Silverman and politely asked him what was going on. Appellant testified that Officer Silverman was rude from the very beginning. She called Mr. Hawthorne and offered the phone to Officer Silverman so that he could speak with Mr. Hawthorne. Appellant testified that she tried to persuade Officer Silverman to let her take the car and gave him the cell phone a second time to speak with Mr. Hawthorne. According to appellant, Officer Silverman threw the phone back at her. This time, appellant testified that she called Officer Silverman "rude," and that he then threw open his car door and hit her with it. Appellant testified that it was at that time that Officer Silverman told her to leave and that she began leaving. However, appellant testified that Officer Silverman was following her and that, when she turned around to see where he was, he was bearing down on her and looked very angry. At that time, Officer Silverman pushed her. When she told him that he could not do that to her, he grabbed her by the hair and maced her. When she bent over screaming in pain, she felt something hit her in the head. Officer Silverman maced her again, and appellant yelled at her sister to call her father. (Tr. 250-261.) When Jackson tried to reach the cell phone, Officer Silverman pulled his gun on her. Appellant testified that she observed Officer Silverman enter the home of Deanna Kem and that she saw them laughing and joking. Appellant also testified that she never observed Officer Silverman doing any paperwork and that the only paperwork she saw was lying on the passenger seat of the cruiser next to him. She testified further that Officer Silverman only asked her to leave one time. (Tr. 274-275.)
 {¶ 12} At this point, appellant again moved for judgment of acquittal, which was overruled by the trial court.
 {¶ 13} In her first assignment of error, appellant argues that there was insufficient evidence for the jury to find her guilty of obstruction of official business and resisting arrest and that her convictions were against the manifest weight of the evidence. For the following reasons, this court disagrees.
 {¶ 14} The test for reviewing the sufficiency of the evidence was set forth in State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonably doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 {¶ 15} The standard for determining whether a judgment in a criminal case is against the manifest weight of the evidence has been set forth by the Supreme Court of Ohio in State v. DeHass (1967), 10 Ohio St.2d 230, paragraph two of the syllabus, which states:
A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court.
 {¶ 16} The test for whether the judgment is against the manifest weight of the evidence is broader than the test for whether there is sufficient evidence to support a conviction. In considering the manifest weight of the evidence, the reviewing court weighs the evidence in a limited sense to determine whether there is sufficient, competent credible evidence to permit reasonable minds to find the defendant guilty beyond a reasonable doubt. The syllabus rule of Jenks, which applies only to a review of the sufficiency of the evidence, requires that the evidence be viewed in a light most favorable to the state. By comparison, a review of the manifest weight of the evidence does not require that the evidence be so viewed, but the ultimate test remains whether the result could reasonably be reached from the evidence. Under both standards, an appellate court must ordinarily defer to the fact finder's resolution of factual and credibility issues. DeHaas, supra
 {¶ 17} Appellant was found guilty of obstructing official business, in violation of R.C. 2921.31(A), which provides, as follows:
No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties.
 {¶ 18} R.C. 2921.31(A) requires proof of an affirmative act that hampered or impeded performance of the lawful duties of a public official. See N. Ridgeville v. Reichbaum (1996), 112 Ohio App.3d 79. The appellant's intent to obstruct, delay, or prevent a public official from carrying out his duties is found in the trial testimony of Officer Silverman and Kem. Intent may be inferred from the actions of the appellant. Purposely obstructing official business is determined from the manner in which it is done, the means used, and all other facts and circumstances in evidence. State v. Puterbaugh (2001),142 Ohio App.3d 185, citing State v. Hardin (1984), 16 Ohio App.3d 243.
 {¶ 19} Appellant argues that nothing in the record supports the contention that she purposely attempted to prevent the officer from doing anything. Appellant contends that the state's case against her is based simply upon her speech and her refusal to leave the scene. Appellant contends that neither of those actions was sufficient to support her conviction.
 {¶ 20} Although the testimony of appellant, her mother, and her sister, conflicted with the testimony of the police officer and one of the witnesses, there was sufficient evidence, when viewed in a light most favorable to the prosecution, from which a reasonable person could conclude that the appellant had acted with purpose to impede the officer's duties. Appellant cites Garfield Heights v. Simpson (1982),82 Ohio App.3d 286, and argues that words alone are not sufficient to support a conviction. In Garfield Heights, officers arrived at Hilltop Lanes to coordinate the service of a warrant. The defendant flagged down the police officer, got out of his car and demanded that all of the police cars get out of the parking lot. The defendant was informed that the officers were on the premises to conduct an operation and that they would not be there long. The defendant began to point his finger at the officer, yelling at him to get all of the police officers off the premises, harassing him and giving him a hard time. The defendant was told again to stop, and the officer got out of his cruiser and asked the defendant for his driver's license. The defendant kept yelling and said they could not arrest him. The police claim that defendant had obstructed service of the warrant because he had delayed the police officer. The court concluded, however, that there was absolutely no evidence that the defendant intentionally impeded the execution of the search warrant, and no evidence that the defendant even knew that this was the purpose of the police officer's presence in the parking lot. Furthermore, the court noted that a person cannot obstruct official business by doing nothing.
 {¶ 21} In the present case, Officer Silverman testified that appellant's face was approximately six inches from his own, and that she continued to yell at him while he was attempting to complete his paperwork. Furthermore, Officer Silverman testified that he informed appellant that she was preventing him from completing his paperwork by her conduct and asked her several times to leave. Unlike the situation in Garfield Heights, there is sufficient evidence, when viewed in a light most favorable to the prosecution, that appellant's repeated harassment and yelling, six inches from Officer Silverman's face, impeded his ability to complete the paperwork relative to the arrest of Grooms. As such, this court finds that there was sufficient evidence to sustain a conviction for obstruction of official business.
 {¶ 22} The charge of obstructing official business was the predicate offense for the charge of resisting arrest. Inasmuch as this court finds that there was sufficient evidence to sustain a conviction for obstructing official business, this court likewise finds that there was sufficient evidence to support a conviction on resisting arrest, and appellant concedes that, provided the arrest itself was a "lawful arrest," under R.C. 2921.33(B), viewing the evidence in a light most favorable to the prosecution, appellant shoved Officer Silverman, repeatedly struck at him, ran from him, and continued to interfere with his ability to place her under arrest.
 {¶ 23} There being sufficient evidence to support the convictions as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.
 {¶ 24} This court is mindful that two very different scenarios were described relevant to the events of August 3, 2002. The state, through its witnesses, depicted appellant verbally harassing Officer Silverman in such a way that she was six inches from his face, yelling and screaming, and repeatedly ignoring his instructions that she walk away and stop interfering with his ability to complete his paperwork. The testimony of appellant, her mother, and her sister portrayed a different picture. Here, appellant was polite, while Officer Silverman had a rude attitude from the very beginning. When told to leave, appellant walked away; however, Officer Silverman followed her, grabbed her, maced her, and repeatedly beat her about the head and face. The jury found the state's witnesses to be more credible and accepted their version of the events. Based upon our review of the evidence, this court cannot say that the jury clearly lost its way and created a manifest miscarriage of justice.
 {¶ 25} Crim.R. 29 provides that upon motion of a defendant or on its own motion, the court shall order the entry of a judgment of acquittal if the evidence is insufficient to sustain a conviction of such offense. Finding that there was sufficient evidence to support appellant's convictions, this court finds that the trial court did not err in overruling her motion for acquittal pursuant to Crim.R. 29.
 {¶ 26} Based on the foregoing, this court finds that the judgment of the Franklin County Court of Common Pleas is supported by the evidence and is not against the manifest weight of the evidence. Furthermore, this court finds that the trial court did not err in denying appellant's motion for judgment of acquittal. As such, this court overrules both of appellant's assignments of error, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Lazarus and Sadler, JJ., concur.